[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION RE: MOTION TO SET ASIDE THE VERDICT
The plaintiff instituted the present action seeking to recover monetary damages for personal injuries received as a result of the negligent operation of a motor vehicle by the defendant. The amended answer filed by the defendant did not allege a special defense, accordingly, any claim of comparative negligence on the part of the plaintiff was not an issue in the case. The jury returned a verdict in favor of the plaintiff in the amount of $2,815.79 for economic damages and $14,000 for non-economic damages, making a total award of $16,815.79. The defendant has filed a Motion to Set Aside the Verdict and asserts two grounds therefor: first, that the court erred in instructing the jury, in response to a request by one member of the jury that she be dismissed from service; and second, that a juror failed to reveal the existence of a relationship with counsel for the plaintiff, thereby depriving the defendant of a fair and impartial jury.
With respect to the first claim, the jury, during the process of deliberation, delivered a note to the court, signed by the foreman, stating: "We are unable to come to an agreement." (Marked Court Exhibit B). Thereafter, the court gave the jury the standard instruction customarily given when jurors indicate an inability to come to an agreement known as the "Chip Smith" charge which is based upon State v. Smith, 49 Conn. 376, 386
(1981). No exception was made by either counsel to that instruction.
Thereafter, the court received a note addressed to the court and signed by an individual juror which stated: "It does not appear to me that the plaintiff's injuries were due to this accident, therefore I don't feel that she deserves compensation with the exception of repairing her car. May I be dismissed since CT Page 5163-WW the jury is not unanimous?" (Court Exhibit C).
Prior to responding to the note filed by the individual juror, the court, on the record, advised counsel that it intended to instruct the jury panel that the court could take no action with respect to an individual juror and that the court would return the jury to the jury room for further deliberations. Both counsel indicated that action of the court was acceptable to them. Thereafter, the court so instructed the jury and both counsel thereafter indicated that they had no exceptions to the instructions given by the court with respect to the note received from the individual juror.
After being returned to the jury room, the jury advised the court (Court Exhibit D) that they had reached a verdict and the verdict was eventually accepted and recorded in open court. Immediately before the court was notified that the jury had reached a verdict, the court was informed by the court clerk that counsel for the defendant wished to make a motion in the absence of the jury and prior to acceptance of the verdict. The court heard an oral Motion for a Mistrial made by counsel for the defendant based upon the fact that the court had received a note signed by an individual juror and not by the foreman of the jury and therefore the Court was sending a signal that the individual juror had to change her mind as to the verdict. The court denied the Motion for Mistrial and thereafter accepted the verdict.
The specific claim made by the defendant is that the court erred in giving a Chip Smith instruction when that instruction was directed to one juror. The defendant's claim is based upon the fact that the court gave a "second" Chip Smith charge after receiving Court Exhibit C. The court's recollection and the transcript do not support such a claim. At the time the court gave the Chip Smith instruction neither counsel nor the Court were aware of the reason why the jury could not come to an agreement. With respect to the note received by the individual juror (Court Exhibit C), the court did not give the Chip Smith instruction but merely advised the jury that it could not take action with respect to an individual juror and returned the jury for further deliberations. No exception was taken by either counsel with respect to the Chip Smith charge and both counsel agreed that the procedure to be employed by the court with respect to Court Exhibit C was acceptable to both counsel prior to the time the court gave that instruction and, indeed, no exceptions were taken after that response was given. CT Page 5163-XX
With or without exceptions, the Chip Smith instruction does not require that a juror change his or her position and the response to Court Exhibit C was proper and appropriate and did not constitute a basis to set the verdict aside or a justification for declaring a mistrial.
With respect to the defendant's claim of the failure of a jury to reveal the existence of a relationship with the plaintiff's attorney, the court, in the beginning of the case, explained the voir dire process to the prospective jurors and requested that they listen attentively to the names that the attorneys provide and then asked if any of the jurors knew or had any relationship with any individuals or entities. One member, Mr. Richard Smith, indicated that he knew Roger Brewer and Garrett Moore but neither of them had ever represented him or a member of his family. Mr. Brewer and Mr. Moore were attorneys in the law firm representing the defendant and the plaintiff respectively. In the absence of the prospective jurors, counsel for the parties (Mr. O'Brien for the plaintiff and Mr. Schecter for the defendant) indicated an awareness that Mr. Smith was an assistant clerk of the court in Waterbury and agreed that Mr. Smith could stay on the panel to be questioned in voir dire. During the voir dire process, Mr. Smith said that he was an assistant clerk in Waterbury who was responsible for the criminal side and some appeals and had previously worked in civil caseflow. When asked if he knew Attorney Moore, Mr. Smith stated, "I know the firm. Yes." And when asked if he knew anyone from their firm personally, he indicated that he could not say personally, "but if he walks by me, I know him." He also stated that he knew Mr. Brewer in the same indicated, although he indicated he had no opinions about either attorney and he respected everybody's work. Upon examination by counsel for the plaintiff, Mr. Smith was asked: "Are you going to let the fact you know Garrett (Moore) or me or anyone else at my firm affect the way you look at this case?" "A No." "Q Could you be fair to both sides?" "A Yes." Whereupon Mr. Smith was accepted by counsel for both parties as a juror.
Following the filing by the defendant of the Motion to Set Aside the Verdict, an evidentiary hearing was held with respect to the plaintiff's claim of the failure to reveal the existence of a relationship between Mr. Smith and counsel for the plaintiff. CT Page 5163-YY
With respect to a prior relationship with trial counsel for the plaintiff, Mr. Smith testified that he knew the firm of Moore O'Brien and that he sees Attorney O'Brien in the courthouse going back and forth walking to the window. He also testified that he may have provided him with a form or something of that nature and he has the same relationship that he has with all the other attorneys who come into the courthouse. At the evidentiary hearing, Mr. Smith testified as follows:
"Q Okay. Now, before the rendering of the verdict it was my understand that you had known Attorney Moore. Correct?"
"A Yes."
"Q And you had known of Roger Brewer. Right?"
"A Yes."
"Q But I was of the impression that you did not know Attorney O'Brien at that point. Was that a mistaken impression?"
"A It was a mistaken impression."
"Q Okay. Could you tell me what the extent of your relationship was with Attorney Moore before the trial took place?"
"A I know the firm of Moore O'Brien. I take care of criminal matters in the courthouse. I see Attorney O'Brien at the courthouse, you know, going back and forth, walking to the window. I may have provided him with a form or something of that nature, the same relationship that I have with all other attorneys that come to the courthouse . . ."
"Q Okay."
"A (Continued) . . . or I see on the street. They say: `Hi.' I say: `Hi.'"
"Q Okay. So your testimony is that you hadn't really — hadn't really had any kind of conversations with Attorney O'Brien except, of course, the general things that you do as a clerk. Is that what you are saying?"
"A Not exactly. What I'm saying is that if I see an attorney, CT Page 5163-ZZ you know, several times and we strike up, I don't want to say a friendship but an acquaintance, and I see that attorney on the street, I might talk about the weather, baseball, basketball, or whatever."
"Q Okay. Had you done that with Mr. O'Brien before?"
"A In the past?"
"Q Yes."
"A I can't really like I say, you know, there is, you know, the whole Waterbury Bar comes in and out of that courthouse. I can't recall whether or not. I can say that I had a conversation before because I knew who he is."
"Q Okay."
"A Okay."
On cross examination by counsel for the defendant, Mr. Smith indicated that he had never had lunch with counsel for the defendant or socialized outside the courthouse and then the following occurred:
"Q Is it basically a `How're you doing? How're you going today? What's the weather like?' type of relationship?"
"A Yes."
There was also questions asked Mr. Smith concerning conversations that he had with counsel for the defendant after the verdict was rendered and testimony was also elicited from an attorney in the office for the counsel for the defendant who overheard a telephone conversation by counsel for the plaintiff with Mr. Smith in Waterbury and the conversation seemed very friendly like people who knew each other and people who have done more than acknowledge each other in the hallway and that it did not appear to be a conversation between someone who knew anyone on a passing basis. However, none of the testimony established the existence of a prior relationship between counsel for the plaintiff and Mr. Smith prior to the rendition of the jury verdict which was in any way different from the nature of the relationship as described by Mr. Smith. The law firms representing both the plaintiff and the defendant engage in an CT Page 5163-AAA active trial practice and it is therefore not unlikely that a clerk of the Court might well have had some contact with members of one or both law firms. It is apparent that the relationship between the juror, Mr. Smith, and the plaintiff's trial attorney, Mr. O'Brien, was nothing more than a passing acquaintanceship arising out of the fact that Mr. O'Brien and his law firm engaged in the practice of law in the same Judicial District where Mr. Smith was employed as a clerk of the Court. These facts were known to both trial counsel prior to the time Mr. Smith was accepted as a juror and he specifically indicated that the relationship, however it may be characterized, would not prevent him from being a fair and impartial juror and nothing has been presented to the Court which would cast doubt on that statement.
The relationship between Mr. Smith and Mr. O'Brien, and/or members of his firm, is not grounds for disqualification as a matter of law and there is no basis for concluding that Mr. Smith intentionally withheld any relevant facts. State v. Kokoszka,123 Conn. 162, 164-165 (1937). There is no basis for concluding that there was any possible prejudice to the defendant or that the defendant did not receive a fair trial or that Mr. Smith did not remain a fair and impartial juror. State v. Askerman, 202 Conn. 429,443 (1987); Klingeman v. MacKay, 25 Conn. App. 217, 221
(1991).
Accordingly, the Motion to Set Aside the Verdict is denied.
RUSH, J.